UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN INGRAM,<br><br>          Plaintiff,<br><br>     v.<br><br>PACIFIC GAS & ELECTRIC COMPANY, et al.,<br><br>          Defendants. | Case No. 12-cv-02777-JST<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 181, 182 |

Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment is now before the Court. ECF No. 181. For the reasons that follow, the Court will grant the motion and enter judgment for Defendants.

## I.   BACKGROUND[1]

### 1.   Plaintiff's employment at PG&E[2]

Plaintiff Steven Ingram is an African-American male who worked for PG&E as a substation maintenance electrician. ECF No. 1, ¶ 5. PG&E first hired Plaintiff on April 15, 2003, as a utility worker for its general construction department. Id., ¶ 9. In November 2006, he became a journeyman electrician. Id., ¶ 14. In 2007, PG&E reassigned Plaintiff to work at the Martin substation, where he underwent switchman training and worked in substation maintenance. Id., ¶¶ 15, 16.

---

[1] In his opposition, the Plaintiff makes much of the lengthy history of contentious discovery disputes in this case. That history is not relevant to the present order, and the Court therefore does not discuss it.

[2] Plaintiff named both Pacific Gas & Electric Company and PG&E Corporation as defendants. See ECF No. 1. For the sake of simplicity, the Court refers to both entities as "PG&E," except where they are expressly distinguished. See section III.E., infra.

On June 29, 2011, PG&E terminated Plaintiff's employment. ECF No. 1, ¶ 24; ECF No. 187-1, Ex. N. Plaintiff alleges that his termination was the result of discrimination by the PG&E employees who supervised him. ECF No. 1, ¶¶ 31-82.

Plaintiff's direct supervisor at the Martin substation was Boris Gankin, the substation maintenance supervisor. ECF No. 184, Decl. of Boris Gankin ("Gankin Decl."), ¶¶ 1, 3-5; ECF No. 204, Decl. of Edward Bonnett ("Bonnett Decl."), ¶ 2. Edward Bonnett, the lead substation maintenance supervisor, was Gankin's supervisor. Gankin Decl., ¶ 5; Bonnett Decl., ¶¶ 1, 2; ECF No. 196-2, Ex. D, Dep. of Edward Bonnett, Feb. 18, 2015 ("Bonnett Dep."), 232:9-21. As substation maintenance supervisor, Gankin's duties included "assigning jobs to maintenance electricians, leading daily tailboards or meetings, ensuring that [his supervisees] provide[d] reliable and safe energy to the public, [] evaluating the work performance and conduct of the maintenance electricians in [his] group, and administering positive discipline pursuant to the terms of the Collective Bargaining Agreement." Gankin Decl., ¶ 6.

### 2. Employee discipline and recognition

PG&E's "Positive Discipline Guidelines" ("PD Guidelines") set forth the steps that supervisors should take when disciplining employees or seeking to improve their work performance. See Gankin Decl., Ex. A; id. at 1. The Guidelines divide employees' behavior into three separate categories: "conduct," "attendance," or "work performance." Id. Whenever a supervisor disciplines an employee, she must specify the particular category in which the discipline is being imposed. Id.; e.g., id., Ex. P. Instances of discipline in one category are not considered in imposing discipline in a different category – i.e., if a first-level discipline is imposed in the attendance category, that discipline does not affect what level of discipline is appropriate if discipline is imposed in another category. ECF No. 203, Ex. E, Dep. of Michelle Lee, Feb. 25, 2014 ("Lee Dep."), 77:18-25; Bonnett Dep. 276:3-21.

The PD Guidelines provide for one informal preliminary step of discipline, three formal steps, and a final step – termination. Gankin Decl., Ex. A. The first, informal step is termed "coaching and counseling." Id. at 1-2. Coaching and counseling "is intended to be a deliberation and discussion between the supervisor and employee," and "[n]ormally, performance problems

can be resolved at this step." Id. at 2.

The next (and first formal) step of discipline is the oral reminder. Id. at 2. At this stage of discipline, the supervisor discusses a problem in the conduct, attendance, or work performance category with the employee in a private meeting. Id. The supervisor memorializes the meeting and keeps documentation of the meeting on file. Id. Oral reminders are "active," such that they can affect subsequent discipline within the same category, for six months. Id.

The next disciplinary step is the written reminder. Id. at 2-3. The PD Guidelines describe a written reminder as "a formal conversation between a supervisor and employee about a continued or serious performance problem," which "is followed by the supervisor's written letter to the employee summarizing the conversation and the employee's commitment to change their behavior." Id. Written reminders are applied when an employee's earlier "commitment to improve is not met within the six (6) months active time period for an oral reminder; or [the] employee commits a serious offense whether or not any previous disciplinary action has been taken." Id. at 3. A written reminder is active for twelve months. Id.

The most severe step of discipline that precedes termination is called decision-making leave, or "DML." Id. DML "consists of a discussion between the supervisor and the employee about a very serious performance problem." Id. After the discussion, the employee is placed on leave the following work day "with pay to decide whether the employee wants and is able to work for PGandE, [which] means following all the rules and performing in a fully satisfactory manner." Id. The work day after the day of leave, the employee reports his or her decision to stay or leave PG&E to the supervisor. Id. This "is an extremely serious step since, in all probability, the employee will be discharged if the employee does not live up to the commitment to meet all Company work rules and standards during the next twelve (12) months"—the active period for a DML. Id. An employee is only allowed one active DML at a time. Id. A supervisor imposes a DML when the "employee's commitment to improve is not met during the twelve (12) month active time period for a written reminder; or [the] employee commits a very serious offense whether or not previous discipline has taken place." Id. at 3-4. The supervisor documents the DML, keeps a copy on file, and provides a copy to the employee. Id. at 4.

1   Finally, "[t]ermination occurs when Positive Discipline has failed to bring about a positive
2   change in an employee's behavior, such as another disciplinary problem occurring within the
3   twelve (12) month active duration of a DML." Id. Termination can also occur "in those few
4   instances when a single offense of such major consequence is committed that the employee
5   forfeits his/her right to the Positive Discipline process." Id.[3]

### 3. Plaintiff's history of discipline at PG&E

Plaintiff's first discipline at the Martin substation was a written reminder arising from an automobile accident. See Gankin Decl., Ex. C at 1, 2. Bonnett issued that discipline on June 12, 2008 in the work performance category. Id. On October 28, 2008, Plaintiff received coaching and counseling for his attendance. Id. at 1. In February 2009, Plaintiff had two incidents of discipline: first, he received a coaching and counseling as a result of a citizen complaint that Plaintiff was changing lanes in his company vehicle without using his turn signal, and second, he was coached and counseling regarding two parking citations he received on the company vehicle. Gankin Decl., Ex. C at 1, 6-7, 10-11, 16.

On June 2, 2009, Gankin again coached and counseled Plaintiff regarding his unpaid parking tickets, and when Plaintiff failed to clear those tickets within one week, Gankin issued an oral reminder in the work performance category relating to those citations. Id. at 1, 6-7, 15. Then, on August 12, 2009, Gankin issued Plaintiff a written reminder relating to a switching error on June 18, 2009 that involved Plaintiff and another employee. Id. at 1, 3, 13-14; Lee Decl., Ex. E at 12-13.

In 2010, Plaintiff received two coaching and counseling sessions from different supervisors relating to his inattention at substation meetings, or "tailboards." Gankin Decl., Ex. C at 1. On January 12, 2011, Plaintiff received an oral reminder for an incident that occurred on December 29, 2010. Id. at 1, 5. On that date, after performing a switching operation, Plaintiff reported that he returned equipment to "the same state as received," but in fact Plaintiff had failed

---

[3] Language in the PD Guidelines suggests that they provide examples of what constitutes a single offense of such "major consequence" as to warrant termination, but the page containing the examples has been omitted from the materials provided to the Court.

4

to return to their pre-switching state the "H3/23 disconnects" that he opened at the beginning of the day. Id. at 5. A switching error resulted when the switch log was turned over to Operations. Id. The error was serious, and caused a customer power outage. Id. But because of Plaintiff's open and honest explanation of the error, what would have been a written reminder was reduced to an oral reminder. Id.

Ultimately, Plaintiff was placed on "crisis suspension," and then his employment with PG&E was terminated based on his failure to report the status of his driver's license to his supervisors and a May 17, 2011 switching error, both of which are discussed more fully below. Id. at 4; ECF No. 187, Ex. N (termination letter); see also ECF No. 183, Ex. A, Dep. of Steven Ingram, Dec. 11, 2012 ("Ingram Dep."), 44:17-24; ECF No. 203, Ex. E at 12.

### 4. Plaintiff's driver's license

On approximately April 24, 2011, Plaintiff was arrested for driving under the influence ("DUI"). Ingram Dep. 74:6-9. The arresting officer took Plaintiff's license card, telling Plaintiff that he thought there was something "going on with [it]" and that he should go to the California Department of Motor Vehicles ("DMV"). Ingram Dep., 93:18-95:21. The officer gave Plaintiff a thirty-day temporary license, which Plaintiff used as his authorization to drive.[4] Id. 101:3-5; see also Gankin Decl., Ex. K.

On May 10, 2011, when Plaintiff reported to work, Gankin informed Plaintiff that he would be performing a driving observation. Gankin Decl., ¶ 21. Before any driving began,

---

[4] The temporary license states, in relevant part:

> This document must be carried with you and shall serve as your temporary California driver's license. It is subject to the same classes and all restrictions as your permanent license. *This temporary driver's license does not provide you with any driving privileges.* If you do not have a California's driver's license or your license is expired, suspended, revoked, cancelled or denied, it expires at midnight 30 days from the issue date of this order shown below.

Ingram Dep. 247:15-25; Gankin Decl., ¶ 32 & Ex. K (emphasis added). The copy attached to the Gankin Declaration is not legible, but the parties do not dispute the language.

5

Gankin asked to see Plaintiff's driver's license. Id. Plaintiff provided Gankin his California identification card, asserting that the card was a valid license. Id., ¶¶ 21, 22. When Gankin asked Plaintiff for a valid license, Plaintiff seemed "very confused," and responded with several explanations, including that the card was a valid license, that he had another copy of his license at home, and that a police officer had taken his license. Id., ¶ 22; Lee Decl., Ex. J; Ingram Dep. 261:22-265:3. Gankin suspended the observation and told Plaintiff to bring his license the next day; while Plaintiff did not have an active license, he would be assigned to work duties that did not require driving. Id., ¶ 23.

Over the next three days, Plaintiff did not report to work, but called in requesting sick-relative and sick days. Id., ¶¶ 25, 26, 27. At some point between May 10 and 11, Plaintiff realized he did not have a copy of his driver's license at home. Ingram Dep. 100:14-15. He went to the DMV on May 11 to attempt to obtain a copy of his license. Id. 100:24-25. DMV employees explained that Plaintiff had a court hold on his license related to tickets for which it was reported to the court that he failed to appear, and that his license had expired March 4, 2010. Id. 101:6-14; Gankin Decl., Ex. L.[5] They also explained to Plaintiff that the temporary license the officer had given him would serve as his license for thirty days after his arrest, and that he was not eligible to receive a card license at that time. Id. 100:23-101:5. The following day, Thursday, May 12, 2011, Plaintiff went to the court in Oakland, and called a court in Atwater to clear the holds on his license that caused it to be suspended. Ingram Dep. 101:15-102:17. Apparently, Plaintiff had "taken care" of the tickets for moving violations he received, but that information was not communicated to the DMV, so Plaintiff's license had been suspended in error. Id.

Plaintiff then returned to the DMV, where employees told him that his license suspension was cleared up, but they still could not give him a permanent driver's license because of his recent DUI arrest. Id. 102:17-103:7. The employees informed him that, using the temporary license the

---

[5] Defendants ask the Court to take judicial notice of records from the DMV that pertain to Plaintiff's driving status. ECF No. 182. Because these are public records, which are generally subject to judicial notice under Federal Rule of Evidence 201, the Court takes notice of them. Lee v. City of L.A., 250 F.3d 668, 688-89 (9th Cir. 2001).

officer gave him, he could drive for the thirty days following his DUI arrest—until approximately May 24, 2011.  Id. 105:1-13.

The evidence is undisputed that Plaintiff violated PG&E policies by failing to report a status change in his driving privileges and by driving without a valid license.  As part of his employment, Plaintiff signed documents that explained PG&E's policies regarding employee driving, including PG&E's "Employee Conduct Summary," and a document entitled "Driving Expectations 'COMMITMENT TO EXCELLENCE'."  See Gankin Decl., Exs. M, N.  The last line of the Employee Conduct Summary prohibits "[d]riving a company vehicle or any other vehicle while on company business in violation of the DMV code."  Id., Ex. N.  The Driving Expectations document required Plaintiff to "maintain compliance with all current motor vehicle regulations as established by the [DMV]"; "promptly report any change in [his] Driver's license status to [his] supervisor"; and promptly report any Motor Vehicle Incident . . . to [his] supervisor."  Id., ¶ 35 & Ex. M.

Plaintiff was aware that if his driver's license ceased to be valid while he worked for PG&E, he was required to inform PG&E of that development.  Id. 136:9-14.  But he claims that he could not "tell, inform, [his] employer of something [he was] not aware of.  So the reason [he] didn't tell [PG&E or his supervisors] that [his] license was revoked and expired [was] because at the time [he] didn't realize that it was revoked and expired."  Id. 152:7-22; see also id. 294:9-23.[6]  Plaintiff asserts that he did not realize, until DMV employees told him in May 2011, that his license had expired and was suspended, and he drove company vehicles after his DUI arrest relying on the temporary license the arresting officer gave him.  Id. 89:10-16; 90:18-24; 249:3-13.

The evidence also shows, however, that if Plaintiff was unaware of the expiration date of his license, it was because he remained purposefully unaware.  Ingram Depo. 90:20-24 ("Because I don't check my license.  I wouldn't know what the expiration date is now.  It's not a normal

---

[6] Plaintiff also explained that he did not tell his supervisors or PG&E about his DUI arrest because he was told by a representative at the DMV that the thirty-day license suspension associated with that arrest would not commence until approximately thirty days after his arrest.  Ingram Dep. 152:2-6; 291:25-292:18.

7

practice."). More to the point, he *was* made aware of the expired status of his license, because in May 2010, he was cited for driving without a valid driver's license. Ingram Dep. 160:4-164:2; 171:8-21. He thereafter continued to drive PG&E's vehicles, and he failed to report the suspension to his superiors. Id. And although he now claims that he thought he has being pulled over for a different violation, id., he also acknowledges that he didn't read the ticket the police officer gave him or any documentation he subsequently received from the DMV. Id. 170:18-172:20.

### 5.  The May 17, 2011 switching error

On May 16, 2011, Plaintiff returned to work after having resolved his driver's license status. Gankin Decl., ¶ 28. On May 17, 2011, he was assigned to perform a switching operation with a less experienced employee who was observing Plaintiff's switching as a training exercise. Id., Ex. G. Plaintiff used an operation log to guide the switching procedure, but failed to perform item 70 on the log. Id. at 1. Plaintiff reported on the log, however, that he had completed the operation. Ingram Dep. 199:13-22.

After the switching procedure was complete, the distribution operator for the area in which Plaintiff was working realized there was an error, and called Plaintiff at the switching site. Id. Plaintiff told the operator that he would investigate the problem and then call back. Gankin Decl., Ex. G; ECF No. 185, ¶ 4 & Ex. A 2:14. But when Plaintiff realized his error, rather than calling the operator back, he attempted to fix it by opening the switch he failed to open at operation 70. Gankin Decl., Ex. G; ECF No. 185, ¶ 4 & Ex. A 5:15-9. This caused an electric arc, and though Plaintiff attempted to close the switch, the arc engulfed the switching equipment, preventing him from doing so, damaging the equipment, and causing 6,134 customers to lose power temporarily. Id. The next day, Plaintiff also realized that the electrical arc burned membranes in his eyes, requiring medical attention. Ingram Dep. 192:2-6; 203:20-204:20. Plaintiff acknowledged that he should not have attempted to fix his error without direction from the operator as to how to do so safely. Id. 211:25-212:3; 218:13-219:2.

### 6.  Plaintiff's termination

After the switching incident, Plaintiff was put on crisis suspension without pay. Patten

Decl., Ex. H at 21; Lee Decl., Ex. J at 2. PG&E conducted an investigation into both the switching error and Plaintiff's driver's license status. See, e.g., Gankin Decl., Ex. E. On June 29, 2011, PG&E terminated Plaintiff due to "unsafe work performance," including the switching error itself and his failure to wear appropriate personnel protective equipment. See Lee Decl., Ex. N. PG&E also cited his driving of company vehicles while his license was suspended or expired, as well as his failure to report the suspended or expired status of his license to his superiors. Id.

### 7. Discipline of other employees

Plaintiff claims that discipline at PG&E was imposed unfairly vis-à-vis African-American employees. In support of this claim, he points to the following:

- An employee named Chris Hackworth received a DUI and was picked up from and dropped off at his home daily and therefore did not have to drive a company vehicle. Ingram Dep. 135:11-15; 148:24-150:14. There is no evidence that Hackworth failed to inform PG&E about his license status, as Plaintiff did. Id. 150:15-151:19.

- An employee at the San Mateo transmission substation, a "couple" of years before Plaintiff was deposed, performed a switching operation that he was not authorized to perform, and did so without a switching log, but was not terminated. Id. 254:18-255:18. That switching error caused an explosion and may have caused an outage. Id. 255:19-256:3. The incident was discussed at a Martin substation tailboard and was the subject of an incident report. Id. 256:7-19.

- Another African-American maintenance electrician made a major switching error that affected over 8,000 customers. Gankin Decl., ¶ 43. That employee was on an active discipline, was dishonest in the ensuing investigation, and was terminated. Id.

- Bonnett gave another employee a DML when that employee caused a switching error that electrocuted another employee. Bonnett Dep. 261:3-263:5.

- An employee Lee identified in investigating the proper discipline for Plaintiff drove with a suspended license for several years and lied to his supervisor on several occasions about his license status. Lee Decl., ¶ 11 & Ex. I. At the time, the employee also had an active written reminder in the attendance category. Id. The employee was terminated. Id. The employee did not grieve his termination, so the case did not serve as precedent regarding the permissibility of his termination under the collective bargaining agreement. Lee Decl., Ex. I at 1.

- Bonnett was unaware of any employees who reported to him that their licenses were suspended during the time that he was a PG&E supervisor. Bonnett Dep. 17:10-14. But when Bonnett was working as a substation electrician, his license was suspended for approximately six months. Id. 15:5-16:15. Bonnett reported that suspension to his supervisor, who allowed Bonnett to work in groups with other employees who would

9

drive Bonnett to work assignments. Id. 16:16-17:9.

Plaintiff could not, however, identify another individual PG&E employee with an overall similar disciplinary record. Id. 257:1-18.

### 8. This lawsuit

Plaintiff brought this case on May 31, 2012, alleging against Defendants: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; (2) harassment in violation of Title VII; (3) retaliation in violation of Title VII; (4) wrongful termination in violation of public policy, as expressed in Title VII and the California Fair Employment and Housing Act, California Government Code section 12940, *et seq.*("FEHA"); (5) harassment in violation of California Government Code section 12940(j); and (6) retaliation in violation of California Government Code section 12900, *et seq.* ECF No. 1, ¶¶ 31-82. In his complaint, Plaintiff sought damages, attorneys' fees, and costs. Id. at 12.

## I. LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is sufficient evidence from which a reasonable factfinder could find for the non-moving party, and "material" only if the fact may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). In evaluating the motion, the Court must draw all reasonable inferences in the light most favorable to the non-moving party. Johnson v. Rancho Santiago Cmty. Coll. Dist., 623 F.3d 1011, 1018 (9th Cir. 2010). But unsupported conjecture or conclusory statements do not create a genuine dispute of material fact and will not defeat summary judgment. Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).

When the moving party does not bear the ultimate burden of persuasion at trial, it must satisfy both the initial burden of production and the ultimate burden of persuasion on the motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at

10

1  trial." Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th
2  Cir. 1990)). If the moving party satisfies its initial burden of production, then the non-moving
3  party must produce admissible evidence to show a genuine issue of material fact exists. Id. at
4  1102-03.

## II.   DISCUSSION

### A.   Race Discrimination

Plaintiff alleges that he was terminated in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e-2(a), which prohibits an employer from "discriminat[ing] against an individual with respect to his . . . terms, conditions, or privileges of employment because of his race." Plaintiff's Title VII claim is analyzed under the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, Plaintiff bears the initial burden of proving his *prima facie* case of racial discrimination—i.e., that: (1) he belongs to a protected class; (2) he performed his job duties satisfactorily; (3) he was subjected to an adverse employment action; and (4) similarly situated non-African-American individuals were treated more favorably than he was. Id. at 802; see also Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006).

"Establishing a *prima facie* case under McDonnell Douglas creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race." Id. "To rebut this presumption," Defendants "must produce admissible evidence showing that [they] undertook the challenged employment action for a 'legitimate, nondiscriminatory reason.'" Id. If Defendants do so, the presumption of discrimination falls away, "and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required in civil cases under Fed. R. Civ. P. 56(c)." Id. (citations omitted). Thus, in an employment discrimination case, "summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race." Id. (citation omitted).

Here, the parties do not dispute that Plaintiff is a member of a protected class or that he was subject to an adverse employment action. Accordingly, the issues in dispute regarding

United States District Court
Northern District of California

Plaintiff's *prima facie* case are whether Plaintiff performed his job in a satisfactory manner, and whether similarly situated non-African-American employees were treated differently than was Plaintiff.

To establish satisfactory job performance, Plaintiff must produce "substantial evidence of satisfactory job performance sufficient to create a jury question on this issue." Douglas v. Anderson, 656 F.2d 528, 533 n.5 (9th Cir.1981). At the *prima facie* stage, the plaintiff need not "eliminate the possibility that he was laid off for inadequate job performance," because such a requirement would "conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing" required at the pretext stage of the McDonnell Douglas analysis. Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 659 (9th Cir. 2002). However, even though courts do not require a "flawless personnel file at all times during employment," Bahri v. Home Depot USA, Inc., 242 F.Supp.2d 922, 931 (D. Or. 2002), a plaintiff who continues to violate company policy despite a clear warning cannot demonstrate satisfactory performance. Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1205-06 (9th Cir. 2008).

Several cases illustrate the need to provide evidence of satisfactory job performance when an employee has a lengthy history of discipline. In Diaz, for example, the plaintiff "over an extended period openly violated Eagle Produce's policy against solicitation on company property and continued to do so even after receiving a warning." 521 F.3d at 1208. The Ninth Circuit concluded on that basis that "no reasonable juror could find that Renteria's performance was satisfactory." Id. In Jackson v. Foodland Super Market, Ltd., 958 F. Supp. 2d 1133 (D. Haw. 2013), the plaintiff violated Foodland's harassment, workplace violence, employee communication, and non-retaliation policies in her dealings with her co-workers. Id. at 1137-38. As her violations continued, she was first reprimanded, then suspended, and ultimately terminated. Id. Citing Diaz, the district court concluded that "Plaintiff ha[d] failed to establish that her job performance at Foodland was satisfactory." Id. at 1139-40. In Pascual v. Astrue, No. C 08-2906 SBA, 2009 WL 1125702, at *5 (N.D. Cal. Apr. 27, 2009), the plaintiff "took an inordinate amount of time to complete basic tasks, performed her job duties inefficiently, was unable to learn certain duties despite repeated training, was unreceptive to criticism and exhibited continuing difficulty

maintaining cooperative and professional relationships with her peers and supervisors." Id. She also "demonstrated questionable judgment and lack of professionalism, as evidenced by the confrontational emails to her supervisors." Id. The district court concluded that "no reasonable jury could conclude that Plaintiff's job performance was satisfactory." Id.

Plaintiff's case is very much of a piece with these prior cases. He cannot prove to a reasonable jury that he was performing his job competently as a substation maintenance electrician. Before the May 17, 2011 switching error and blow-up, Plaintiff made three other switching errors within a four-year period, causing major power outages to thousands of customers, including a July 24, 2007 error that affected customers in San Francisco; a June 18, 2009 switching error that affected 15,136 customers; and a December 29, 2010 switching error that created a customer outage. Gankin Decl. at ¶ 10, Ex. C.  PG&E issued an Oral Reminder to Plaintiff for the December 29, 2010 switching error. Ingram Depo. at Ex. 9; 258:10-259:7.  In addition, Plaintiff received no fewer than eleven Oral and Written Reminders and instances of counseling during the same four-year period concerning his work performance and conduct at PG&E, including failure to report and pay parking tickets on company vehicles and failure to follow rules and orders. Gankin Decl. at ¶ 9, Ex. C.

Plaintiff also failed to report the status of his driver's license for over two years, as required by company policy, and his explanation was less than complete and accurate when specifically questioned by his supervisor about his driver's license.  He ignored his supervisor's directive and PG&E's written regulations not to drive company vehicles without a valid driver's license.  As Judge Alsup recently said regarding a similar situation involving a PG&E employee, "No reasonable jury could find his unavailability and unreliability satisfactory work performance for a PG & E utility lineman, installing and maintaining our country's utility lines." Veloz v. Pac. Gas & Elec. Co., No. C 12-06309 WHA, 2014 WL 1865786, at *12 (N.D. Cal. May 8, 2014).  The Court reaches the same conclusion here.

Plaintiff's opposition to Defendant's summary judgment motion does not address this prong of the McDonnell Douglas test – whether Plaintiff's job performance was satisfactory – at

all.[7] ECF No. 196. The Court's own review of the record, however, reveals two items of evidence that are potentially favorable to Plaintiff on this score. First, Ingram earned above-average scores on his exams in his switchman-training courses in 2010 and 2011, Gankin Decl., Ex. H. Second, Ingram was assigned to train another employee during one of his switching errors, or at least, another employee was required to observe Ingram perform a switching operation. Ingram Depo. 197:20-24. But these two facts, standing in isolation, are not the "specific, substantial" showing of satisfactory performance our cases require.

      Plaintiff also argues that other, non-African-American employees were treated more favorably than he was. Ordinarily, the Court would consider this evidence in evaluating whether the employer's reason for termination was pretextual, rather than whether Ingram's performance was satisfactory. Even considered at this stage of the analysis, however, the Court finds that the evidence does not create a triable issue of fact, because Plaintiff has not shown that other employees were similarly situated. "[I]n general, we have upheld inferences of discriminatory motive based on comparative data involving a small number of employees when the plaintiff establishes that he or she is 'similarly situated to those employees *in all material respects*.'" Beck v. United Food & Commercial Workers Union, Local 99, 506 F.3d 874, 885 (9th Cir. 2007) (emphasis added) (quoting Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006)). "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." Vasquez v. Cnty. of L.A., 349 F.3d 634, 641 (9th Cir. 2003), as amended (Jan. 2, 2004).

      Here, no comparator PG&E employee identified by Plaintiff had as poor a record as Ingram of negative discipline, unsafe job performance, and violation of PG&E's driving regulations. It is not evidence of discrimination – or evidence of Plaintiff's satisfactory job performance – when employees with less serious records of misconduct receive less serious

---

[7] Plaintiff's opposition does attempt to incorporate a large percentage of everything Plaintiff has ever said to the Court in the course of the litigation. ECF No. 196 at 1 n.5 ("Plaintiff focuses the present opposition on the evidence obtained since the Court granted Plaintiff's Motion Pursuant to Fed. R. Civ. P. 56(d). (Dkt # 111-1, # 150). Plaintiff requests that the Court reference the procedural history of the case, including (Dkt## 40, 44, 47, 68, 69, 70, 71, 74, 75, 76, 79, 80, 87, 90, 91, 123, 124, 129, 135, 146, 150, 153, 154, 155, 156, 170, 173, 175, 178, 190)."). The Court will not read through 30 prior submissions to unearth Plaintiff's arguments.

discipline. Wall v. Nat'l R.R. Passenger Corp., 718 F.2d 906, 909 (9th Cir. 1983) ("When warranted by the circumstances, an employer may discipline repeat offenders more severely than first-time offenders."); see also Aragon, 292 F.3d at 663 (holding that evidence that three of four employees laid off were white did not "account for possible nondiscriminatory variables, such as job performance").

In a close case, the Court must deny summary judgment. Davis v. Team Elec. Co., 520 F.3d 1080, 1096 (9th Cir. 2008). But this is not a close case. No reasonable jury could find that Plaintiff's job performance was satisfactory, and Defendants are therefore entitled to judgment on Plaintiff's racial discrimination claim.[8]

### B.  Harassment

Plaintiff has also alleged that Defendants engaged in racial harassment under Title VII and FEHA. Both harassment claims are subject to the same general analysis. See Reno v. Baird, 18 Cal. 4th 640, 647-48 (1998) (applying federal Title VII law to Plaintiff's California FEHA harassment claim). Under Title VII and FEHA, to make out a harassment claim, Plaintiff must prove: (1) that he was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive work environment. Vasquez, 349 F.3d at 642 (citation omitted).

Defendants contend that both Plaintiff's Title VII claim and his FEHA claim fail because "personnel management activities such as hiring and firing, job assignments, performance evaluations, and the like, do not come within the meaning of harassment." ECF No. 181 at 2- (citing Reno, 18 Cal. 4th at 646-47). Plaintiff has not opposed Defendant's motion for summary judgment of his harassment claims.

The Court will enter judgment for Defendants on this claim.

### C.  Retaliation

---

[8] Because Ingram has failed to establish a *prima facie* case of discrimination, the Court does not complete the remainder of the McDonnell Douglas analysis with respect to his race discrimination claim. Diaz, 521 F.3d at 1208.

Both FEHA and Title VII prohibit employers from taking adverse employment actions against employees who complain about discrimination or harassment at work. Under Title VII, the following elements comprise a *prima facie* case of retaliation: (1) the plaintiff engaged in a protected activity; (2) the plaintiff suffered an adverse employment action; and (3) the protected activity and the adverse employment action were causally connected. Surrell, 518 F.3d at 1108.

Plaintiff has not opposed Defendants' motion for summary adjudication of his retaliation claim, and the Court will enter judgment in Defendants' favor.

### D. Wrongful Discharge in Violation of Public Policy

Plaintiff's claims for wrongful discharge in violation of public policy, as expressed in California law and Title VII, are analyzed pursuant to McDonnell Douglas. Lewis v. Pac. Maritime Ass'n, No. C 06-04941 CRB, 2007 WL 2429554, at *4 (N.D. Cal. Aug. 24, 2007) (citing Sada v. Robert F. Kennedy Med. Ctr., 56 Cal. App. 4th 138, 148 (1997)). Plaintiff has not opposed Defendants' motion on this claim.

Because the Court will enter judgment for Defendants on Plaintiff's racial discrimination claim under Title VII, it will enter judgment for Defendants on the wrongful discharge claim as well.

### E. PG&E Corporation

Defendants also seek summary judgment as to Defendant PG&E Corporation. ECF No. 181 at 23-24. Defendants assert that at all times, Plaintiff was an employee of Pacific Gas & Electric Company, not PG&E Corporation, and therefore the Court should grant summary judgment in favor of PG&E Corporation as to all of Plaintiff's claims. Id. (citing Ingram Dep. 303:17-25 & Ex. 15; Gankin Decl., ¶ 2). Plaintiff has not opposed Defendants' motion in this regard and has identified no evidence establishing a direct employment relationship between Plaintiff and PG&E Corporation.

Under both FEHA and Title VII, liability is predicated on the existence of an employment relationship.[9] See Reno, 18 Cal. 4th 644-45; Watson v. Gulf & W. Indus., 650 F.2d 990, 993 (9th

---

[9] Under FEHA, not just an employer, but "any other person" may be held liable for harassment. Reno, 18 Cal. 4th at 644. Because Plaintiff's FEHA harassment claim is legally inadequate, the

16

Cir. 1981) (citations omitted).  Here, all the documents pertaining to Plaintiff's employment are labelled "Pacific Gas & Electric Company," and Pacific Gas & Electric Company is listed as Plaintiff's employer on his I-9 form.  See Ingram Dep., Ex. 15.  Plaintiff has failed to produce evidence suggesting that he was employed by PG&E Corporation, and in the absence of such evidence, the Court will not impute an employment relationship to Pacific Gas & Electric Company's parent entity, PG&E Corporation.  See Watson, 650 F.2d at 993.  Accordingly, the Court finds that PG&E Corporation is entitled to judgment in its favor.

### F.  Punitive Damages

Finally, Defendants contend that the Court should grant summary judgment as to Plaintiff's prayer for punitive damages.  ECF No. 181 at 24-25.  Because the Court has granted summary judgment on all of Plaintiffs' substantive claims, the Court need not reach this issue.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to all substantive claims against both Defendants.[10]  All pending deadlines and hearings in this action are VACATED.  Defendants shall submit a proposed form of judgment within five court days.

IT IS SO ORDERED.

Dated:  April 13, 2015

_____
JON S. TIGAR
United States District Judge

---

Court does not address whether PG&E Corporation qualifies as "any other person" for the purposes of FEHA harassment liability.

[10] Defendants' evidentiary objections, ECF No. 202 at 13-15, are overruled.